Pages 1 - 69

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Larry Alan Burns, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | NOS. 16-CR-07053-LAB |
| Plaintiff, | ) | 16-CR-07054-LAB |
| | ) | 16-CR-07055-LAB |
| VS. | ) | |
| | ) | |
| SCOTT ALEX SHOFLER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

San Diego, California
Tuesday, November 7, 2023

**TRANSCRIPT OF PSYCHIATRIC REPORT HEARING AND SENTENCE ON REVOCATION OF SUPERVISED RELEASE HEARING**

**APPEARANCES:**

For Plaintiff:

TARA K. MCGRATH
United States Attorney
880 Front Street, Room 6293
San Diego, California 92101
BY: **SHAUNA R. PREWITT, ESQ.**
**ASSISTANT UNITED STATES ATTORNEY**

For Defendant:

FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California 92101
BY: **SARA MARIE PELOQUIN, ESQ.**
**NORA L. STEPHENS, ESQ.**
**ASSISTANT FEDERAL PUBLIC DEFENDERS**

Reported By:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

| | |
|---|---|
| 1 | <u>**Tuesday - November 7, 2023**</u>                                    <u>**10:04 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---000--- |
| 4 | **THE COURT:**  Good morning, everyone. |
| 5 | Please have a seat. |
| 6 | **ALL:**  Good morning, Your Honor. |
| 7 | **THE COURTROOM CLERK:**  Calling Matters 1 through 3, |
| 8 | 16-CR-7053, 16-CR-7054, and 16-CR-7055, United States of |
| 9 | America versus Scott Alex Shofler. |
| 10 | If counsel could state their appearances, please. |
| 11 | **MS. PELOQUIN:**  Good morning, Your Honor. |
| 12 | Sara Peloquin, Federal Defenders, on behalf of Mr. Shofler, |
| 13 | who's present before the Court.  He's in custody. |
| 14 | **THE COURT:**  All right.  Good morning. |
| 15 | **MS. PREWITT:**  Good morning, Your Honor. |
| 16 | Shauna Prewitt on behalf of the United States. |
| 17 | **THE COURT:**  Good morning, Ms. Prewitt. |
| 18 | This matter was on for the Court to adjudicate alleged |
| 19 | violations of supervised release. |
| 20 | It wasn't clear to me.  I looked at the docket.  Has |
| 21 | Mr. Shofler admitted to the allegations? |
| 22 | **MS. PELOQUIN:**  He has, Your Honor. |
| 23 | **THE COURT:**  So what was left is just imposing a |
| 24 | sanction, if one is necessary here? |
| 25 | **MS. PELOQUIN:**  Yes, Your Honor. |

1          **THE COURT:**  Okay.  Well, let me tell you what I have

2     read, then.

3          I went back through everything, including the petition.

4     There were other documents pertaining to Mr. Shofler's past

5     convictions, including a presentence report that I've reviewed.

6     I think there are two; one from 2000, one from 2002.

7          **MS. PELOQUIN:**  Yes.

8          **THE COURT:**  The United States filed a sentencing

9     memorandum.  I have reviewed that.  The defense, likewise,

10    filed memoranda in the case, and I have reviewed that.

11         Both parties submitted psychiatric reports.  I have

12    reviewed those, the initial reports and then the reply by the

13    defense' psychologist to the Government's psychiatric report.

14    I've seen a number of other documents, one having to do, I

15    suppose, with the fellow that was the victim of the murder that

16    Mr. Shofler was convicted of committing while in prison.

17         I have looked at the CV of Dr. Badre.  I'm not sure,

18    Ms. Peloquin, that I got a CV from the psychologist.  Let me

19    make sure of that.  I was looking for it again this morning.

20         **MS. PELOQUIN:**  I can -- I can have that emailed to

21    your courtroom deputy, if that would -- if we haven't provided

22    it to the Court.

23         **THE COURT:**  I don't think it's been provided.

24         Did the Government get a copy of that?

25         **MS. PREWITT:**  I don't recall seeing one, Your Honor.

1          **THE COURT:**  So I think it would be important for me to

2     look at that because there's a dispute between the two medical

3     health professionals, and I have reviewed the qualifications of

4     the Government's expert.

5          But other than knowing that your expert is a doctor of

6     psychology, I don't have any other information about -- it's a

7     female; right?  Her?

8          **MS. PELOQUIN:**  Yes.  Dr. Kirschenbaum.

9          **THE COURT:**  Yeah.

10     -- Dr. Kirschenbaum's background, training and experience,

11     publications, peer-reviewed things, so on and so forth.

12          So that's a summary.  I've also looked at the transcripts,

13     which weren't very meaningful, in front of Judge Benitez,

14     having to do mostly with production of more materials to each

15     side.

16          Have I missed anything in my recounting of things that I

17     should have read in connection with this?

18          **MS. PELOQUIN:**  I don't believe so, Your Honor.

19          **MS. PREWITT:**  No, Your Honor.

20          **THE COURT:**  Okay.  So if you can get me a copy of

21     that, Ms. Peloquin, I think it's important to the analysis.

22          The other thing I would say is this.  I was queried -- I

23     was out of town.  I took an assignment in Jacksonville,

24     Florida, trying a case.  And while I was out of town, my

25     courtroom deputy sent me an email -- she may have sent one just

before I left, too -- asking if I thought it was necessary to
have live testimony in this case.

And I held her off the first time I got it because I
hadn't read the reports thoroughly yet.  Then I read them, and
I emailed her back and said, "I don't think I need it."

Now, it's your case.  And if either of you want to present
the witness live here and cross-examine or take testimony from
them, I'm open to that.  I don't want you to think that I'm
foreclosing the presentation of live testimony by your
respective experts.

Do you have any desire, Ms. Peloquin, to cross-examine the
Government's expert or to put your own expert on the witness
stand?

**MS. PELOQUIN:**  Only to the extent that the Court
obviously would -- would find it helpful to hear from the
expert or if the Court would have particular questions.  I know
the Court has read everything carefully and is inquisitive.

So to the extent that it would be helpful to Your Honor, I
would be happy to have Dr. Kirschenbaum come, but --

**THE COURT:**  You know, I'm not sure it will, to be
honest with you.  I thought that I could get by on the basis of
the reports, and let me tell you what my -- my conclusion was
based on.

I handled a lot of these cases when I was in practice, and
I have -- I had a lot of experience with psychiatric testimony,

1    in particular cross-examining psychiatrists and presenting

2    psychiatric testimony myself a few times.  Most of the time, I

3    relied on -- on just cross-examining psychiatrists.

4        So I know the terms.  I'm familiar with the DSM.  We're up

5    to DSM-V at this point.  I have my law clerk, at this point,

6    bringing a copy of that publication here because, of course,

7    both reports refer to it, and their diagnoses are based on the

8    criteria set forth in that publication.

9        I'm not saying any of that to brag.  I'm just telling you

10   why I didn't think it would be important for me to hear from

11   live witnesses, having thorough reports from each.  But, again,

12   I don't want to -- I don't want to cut you off.  If you think

13   it would be helpful or necessary for me to hear from your

14   expert, then, you know, we can postpone this, and you can bring

15   them in.

16       I -- I was asked directly did I think I needed it.  My

17   answer was, "No."

18        **MS. PELOQUIN:**  And, Your Honor, the reason I think

19   that both sides had intended to bring experts for live

20   testimony was that it was a request that Judge Benitez had had.

21        **THE COURT:**  Ah.

22        **MS. PELOQUIN:**  And so it was at his request that we

23   were intending to present live testimony.  Again, I think it's

24   mainly, you know, if the Court has questions or if the Court

25   feels that there may be additional questions that could be

1    answered.

2         But otherwise, I think both experts have written lengthy

3    reports, and they have said what they had to say, and I'll do

4    my best.  If there's anything that the Court has questions

5    about, I'm sure Ms. Prewitt will do her best as well to answer.

6    And if we can't satisfy the Court with our answers, then

7    perhaps we -- we can bring testimony.

8         But I wouldn't want to take up the Court's time if it's

9    not going to be useful.

10        **THE COURT:**  Yeah.

11        Okay.  Well, I don't think you should worry about that.

12   It's a question of what you think is best for your case.  And

13   if you're content to go forward, with me having read thoroughly

14   both reports and the reply from Dr. -- Kirschenbaum?

15        **MS. PELOQUIN:**  Yes, Your Honor.

16        **THE COURT:**  Yeah.

17        -- then -- then I'm content to do that as well.

18        Is that -- are you satisfied with that?

19        **MS. PELOQUIN:**  Yes, Your Honor.

20        **THE COURT:**  Ms. Prewitt, on behalf of the

21   United States, do you have any desire to cross-examine

22   Dr. Kirschenbaum or put your witness on, Dr. Badre?

23        **MS. PREWITT:**  Dr. Badre.

24        Your Honor, I believe that both sides have thoroughly

25   briefed their issues.

1           THE COURT:  Okay.

2           MS. PREWITT:  So I don't think it's necessary.

3           THE COURT:  All right.  So I'm content, then, making

4    the finding that neither side is requesting live testimony from

5    the dueling experts in this case.

6        That said, I'm happy to hear from you, then, Ms. Peloquin,

7    on behalf of Mr. Shofler.

8           MS. PELOQUIN:  Thank you, Your Honor.

9           THE COURT:  By the way, I just was handed

10   Dr. Kirschenbaum's CV.

11          MS. PELOQUIN:  Yes, Your Honor.

12          THE COURT:  So I have it.

13          MS. PELOQUIN:  Would the Court like to have a moment

14   just to review it?

15          THE COURT:  No.  I -- before I get to making any

16   findings, I'll review it carefully.

17          MS. PELOQUIN:  Okay.  Thank you, Your Honor.

18       The request that the defense is making in this case --

19   first of all, Mr. Shofler has been in custody, awaiting

20   sentencing on this violation -- or these three violations for

21   the past two years.

22          THE COURT:  Uh-huh.

23          MS. PELOQUIN:  So he has already served a significant

24   sanction.

25       The request that I have made in my papers and I make to

```
 1   the Court today is to consider releasing Mr. Shofler and
 2   holding sentencing in abeyance, and the reason that I've asked
 3   for that and not -- I'm not asking for time served.  I'm not --
 4   I'm asking for Mr. Shofler to have an opportunity to show
 5   goodwill to the Court and that he can succeed on supervised
 6   release.
 7        If he were to not succeed during the time that he was
 8   released and the violations were held in abeyance, the Court
 9   would have the full sanction still available to the Court.  And
10   so that's why we're asking to hold it in abeyance and to see
11   how Mr. Shofler does.
12        Essentially --
13             THE COURT:  May I ask you about that?
14        What -- have there been incidents -- during the two years
15   that he's been in custody, await -- awaiting this, have there
16   been incidents in the MCC or wherever he's being held?
17             MS. PELOQUIN:  There were at -- at GEO --
18             THE COURT:  What were they?
19             MS. PELOQUIN:  -- I believe, and I think --
20             THE COURT:  I don't think I got any information on --
21   on that.
22             MS. PELOQUIN:  Or maybe it was at San Luis.
23        There have been -- Mr. Shofler was -- he was attacked by
24   some other inmates.  He had been sent to the hospital.  There
25   have been times he's been sent to the hospital for suicidal
```

1  ideation.  I believe that there were also conflicts with --

2  with guards at San Luis.  We did explain in our sentencing

3  memo, though, there was a time when he was sent to San Luis,

4  and he had been receiving medication at GEO here in San Diego,

5  and he had been doing rather well.

6      Sometimes, when folks are transferred from one jail to

7  another -- another, their medication regimen is changed

8  abruptly, or it's sort of left to lapse, and that's what

9  happened with Mr. Shofler.  His medication, essentially, was

10  left to lapse and then changed in a way that didn't suit him.

11      He did contact us right away and said, you know, "I'm not

12  getting my medications.  I'm not feeling well," you know, and

13  so we asked -- and I believe we provided the Court with a copy

14  of the email that we sent to the Marshal Service asking --

15          **THE COURT:**  Somebody -- Nora?  Is that who --

16          **MS. PELOQUIN:**  That's correct.  Ms. Stephens, who's

17  here at counsel table.

18          **THE COURT:**  Oh.  Okay.  All right.

19          **MS. PELOQUIN:**  So we did ask to intervene so that

20  Mr. Shofler could return to GEO or at least have his medication

21  regimen restored.  I believe he was then returned to GEO, his

22  medication regimen was restored, and Mr. Shofler has felt a lot

23  better with the appropriate medications at the time.

24          **THE COURT:**  Have you been able to chronicle the number

25  of incidents there have been while he's been in custody on --

1    on -- thank you.

2              **THE LAW CLERK:**  First half.

3         **THE COURT:**  Yeah.  Thank you.

4       -- while he's been in custody on -- on this violation?

5         **MS. PELOQUIN:**  I have not, Your Honor.

6         **THE COURT:**  Do you know whether additional incidents

7    occurred after he was back at GEO and on his medication?

8         **MS. PELOQUIN:**  I don't know if there are any

9    additional incidents.

10        **THE COURT:**  Okay.  Go ahead.

11        **MS. PELOQUIN:**  So, Your Honor, my request is, as I

12   said, to allow Mr. Shofler to -- to be released.  We do have a

13   release plan, and I think that's the key here.

14       In 2015, you know, he went straight from a USP, where he

15   had been for many, many years over the course of his, you know,

16   his early youth, his 20s, his 30s, and, you know, was sort of

17   released without very much of a plan.

18       Now, to be clear, Mr. Shofler's family is in court here

19   today, his sister, his brother-in-law, and his niece, all of

20   whom he intends to live with eventually after he completes a

21   program.

22        **THE COURT:**  Right.

23        **MS. PELOQUIN:**  They have been supportive of him over

24   the years.

25        **THE COURT:**  I read the sister's letter.  I'm -- I'm

1  aware of that planning.

2        **MS. PELOQUIN:**  Perfect.   Thank you, Your Honor.

3        And so the question here, I think, is -- and, essentially,

4  this is the crux of the matter.   Mr. Shofler is not -- is

5  someone who will get out of custody someday.   You know, there's

6  a maximum here.   Even if the Court were to sentence him to the

7  maximum, someday Mr. Shofler will be released, and he will be

8  on supervision.

9        **THE COURT:**  Right.

10       **MS. PELOQUIN:**  And I think the question here, for the

11 safety of Mr. Shofler and for the public, is whether he's

12 released when he's stable, when we have wraparound services and

13 a -- and a plan, or whether he's released sometime in the

14 future where perhaps those things are not in place.

15       And, again, I don't mean to cast any aspersions at

16 Probation in any way, shape, or form or -- I understand they

17 have a very difficult job to do, and the transition between the

18 BOP and Probation, I think, is not always up to them or

19 necessarily particularly smooth.

20       So for example, in this case, it was the BOP who made the

21 decision to release him directly without having halfway house

22 time.   And I believe, in our district, we do have a program

23 where individuals can go to the halfway house, and Probation

24 starts early with them before their sentence is fully up so

25 that they can start, you know, looking towards programming or

1    looking towards mental health services or the types of services

2    they may need once they're on supervised release.

3         And I think that's a commendable program that we have in

4    our district, but --

5              **THE COURT:**  What year did he begin supervision in this

6    district?

7              **MS. PELOQUIN:**  I believe it was in 2015.  It was very

8    shortly before the violation.  He wasn't out -- but he was not

9    out of custody that long.  But during that time, he did make

10   some positive strides.  He had a job already, and he was

11   working.  He was living with his sister.

12        So, you know, it wasn't as though he did nothing positive

13   during that particular period, but he had not yet had mental

14   health services engaged or any other treatment services

15   engaged.  So I think this was early in the supervision, where

16   services were necessary, but they hadn't yet come to fruition.

17        And so what we want to avoid is a circumstance where he's

18   released again and there's a gap where he's out in the

19   community and we don't have sort of immediate wraparound

20   services.

21        And so that's what I'm proposing to the Court.  I think

22   that that's the best way to ensure that Mr. Shofler can be

23   successful on supervision.  I think it's the best way to

24   protect the public.

25        At the end of the day, you know, Mr. Shofler is not --

1   he's not going to get a life sentence today and hopefully

2   never.  But my point, really, is just that, at some point, he's

3   going to be released into the community.  And to do it safely,

4   I think we need to do it in -- in a manner that is going to be

5   most permanent to him.

6        Now, having said that, over the last couple of years in

7   working with Mr. Shofler, it's become very clear to me he's a

8   very, very smart man.  He reads a lot of books.  He's

9   interested in languages.  He loves to learn.

10       And when we learned of the program at -- at

11  Palomar Community College for individuals who have spent long

12  times in prison, some people who have been sentenced to life

13  sentences and whose sentences were commuted -- that is a

14  program that is available to him.  He's been accepted into that

15  program.

16       We've spoken with the -- the woman who is the head of that

17  program, and she's provided a letter to the Court, and she

18  feels that Mr. Shofler would be an excellent addition to the

19  program.  She has other students who have similar backgrounds

20  to Mr. Shofler.

21       So he wouldn't be an out-of-the-ordinary student for that

22  particular program at Palomar College, individuals who have

23  similar convictions to Mr. Shofler, similar prior associations,

24  and none of those things phased her.  She understood that --

25  you know, how to help those individuals readjust.

1          Part of the curriculum at the Palomar Community College is

2     reentry services.  So the idea is to bring individuals who are

3     inclined and have the aptitude into the academic community but

4     also provide them with significant amounts of counseling and

5     services.

6          There are a lot of individuals who have been part of the

7     program, who have graduated from the program, who continue to

8     associate with the program and provide services to the

9     individuals who are newly arrived.

10          **THE COURT:**  What's the -- what's the duration of the

11    program?

12          **MS. PELOQUIN:**  So there's a summer program, which is

13    kind of the matriculation for individuals with -- in this

14    particular area.  But after that, the idea is to move people

15    into regular classes.

16          And it's Mr. Shofler's goal to ultimately, you know,

17    attend Palomar Community College and eventually be accepted to

18    a four-year school, which is something that has happened for

19    individuals before.

20          There are folks from this particular program who have gone

21    on to UCLA, who have gone to UCSD.  So the idea is that's sort

22    of the beginning.  There's this summer school, and the idea is

23    then to get them into regular classes but continue to provide

24    wraparound support while they're in school.

25          So it's not something that we expect to end after a couple

1   of months.  It's hopefully a lifetime association that

2   Mr. Shofler will have even after he graduates or perhaps moves

3   on to another academic program.

4       I think -- this is also something, you know, we've

5   discussed with his family.  They're extremely supportive.  They

6   live not very far away at all from Palomar College.  I think

7   it's, like, a ten-minute walk from their house to the college.

8       **THE COURT:**  Is he entitled to any public benefits,

9   Mr. Shofler?  Does he -- does he qualify for social security

10  disability, anything like that?

11      **MS. PELOQUIN:**  We have not made an application for

12  social security disability.  That's something we can certainly

13  assist him with, but my understanding is that his family is

14  fully ready to financially support him.

15      **THE COURT:**  Okay.  I see his -- you're -- you're the

16  sister?

17      **THE DEFENDANT'S SISTER:**  Yes, Your Honor.

18      **THE COURT:**  I see his sister shaking her head

19  affirmatively.

20      **MS. PELOQUIN:**  Yes, Your Honor.

21      So ultimately, unless the Court has questions -- I know

22  I've written most of these things in my papers.  But, you know,

23  I've spent two years meeting with Mr. Shofler, discussing his

24  hopes and dreams and his plans.

25      And I can tell you that, you know, the things that

```
 1    interest him, again, are, you know, he's interested in having
 2    an academic career.  That's something he's -- he's really
 3    passionate about.  He writes short stories.  He writes poetry.
 4    He listens to music.
 5        He's certainly -- he's spent a lot of time alone in his
 6    life, and he's spent that time with his nose in books and
 7    trying to -- to better himself somewhat.  But he wants to be
 8    able to do that in a more formal capacity, and he feels really
 9    excited about that.
10        I can also tell you that the other goals that Mr. Shofler
11    has are the goals that I think all of us have.  He would like
12    to have friends.  He would like to have pro-social ties to
13    individuals that, you know, are not people in a prison, in
14    which there are all of these politics, in which there's fear
15    and mistrust and a hierarchy and a pecking order.  He would
16    like to have just a genuine friend who has mutual interests.
17        I know that his nephew is very interested in weightlifting
18    and bodybuilding, and that's also an interest that Mr. Shofler
19    has over the course of the time -- the last two years that
20    Mr. Shofler has been in custody.  And I wrote about this a
21    little bit in my memo, but --
22            THE COURT:  Uh-huh.
23            MS. PELOQUIN:  -- you know, Mr. Shofler has lived
24    under these -- in these circumstances in which a lot of the
25    people around him have been very violent.  And, certainly,
```

1   Mr. Shofler doesn't deny that he has engaged in violence as

2   well.  That's part of the culture of these very high-security

3   federal prisons.

4        Because of that fear, he's really spent a lot of time

5   making sure that his body was just as big as possible.  And

6   he's spoken to me about sort of overeating, about, you know,

7   if -- if there were cookies to be had or any commissary to be

8   had, that you eat all of it because the idea is the bigger you

9   are, the much less likely it is that somebody can mortally

10  wound you if somebody, you know, comes for you.

11       And that -- in sort of talking about that mentality, how

12  to protect himself, how -- how much he has been closed off from

13  genuine connection with other people that he can trust and how

14  he needs to sort of let that guard down.

15       I know, over the last couple of years, he's been working

16  on working out and eating healthier and wanting to sort of get

17  back in shape but ultimately to let go of this outer shell that

18  he's created for himself, that's all about protecting himself

19  from other people.

20       I think he knows that, going forward, he has a lot of work

21  to do.  He's going to need a lot of counseling and a lot of, I

22  think, therapy and direction.  There's certainly going to be

23  times when he's going to be stressed, as we all are.  And, you

24  know, at 46 years old, he needs to figure out strategies, how

25  to be in the real world and deal with that stress in a way that

 1   is appropriate.

 2        And I think he's beginning to understand that those are --

 3   that's the -- that's the place he's starting at.  He's starting

 4   at square one because so much of his life and his early life,

 5   his socialization, was in custody.

 6        So I think, acknowledging that he has those deficits and

 7   understanding those deficits, Mr. Shofler is now prepared to

 8   receive help, understand that he needs help, and ask for help

 9   when he knows that he's struggling.  And I think that he can be

10   successful.

11        My fear is that we can just warehouse him for -- he's been

12   in for two years.  I know the Court can ultimately sentence him

13   to much more time than that.  We can warehouse him for another

14   three years or five years, but he'll most likely go back to a

15   USP, be back in the same types of environments that make him

16   hypervigilant.  They're not good for his mental health.

17        I don't know that he'll be released to a halfway house.  I

18   don't know that Ms. Stephens and I will -- will continue to be

19   at Federal Defenders in, you know, three or five years to help,

20   you know, with the release plan.  You know, there are a lot of

21   unknowns, obviously, and I recognize that the Court -- at some

22   point, we have to, I think, take a leap of faith with

23   Mr. Shofler.

24        And he has -- as I said, he's -- it's -- we're not asking

25   for time served, and it hasn't been two months or four months

1   or six months.  It's two years that he spent in custody in this

2   particular instance.  So with as many safeguards as -- as the

3   Court can impose, and with the release plan that we are

4   proposing to the Court, we ask the Court to consider releasing

5   Mr. Shofler so that we can go forward with this plan.

6       And obviously, you know, it's -- it's for him to prove to

7   Your Honor that he can do this.  And if he doesn't, then he'll

8   be right back here, and the Court has the full sanction

9   available, and there will be nobody else to answer for it but

10  himself.

11          **THE COURT:**  So, Ms. Peloquin, I have two other

12  questions for you.  The first has to do with what his exposure

13  is.

14      The Government sets forth what they believe the guidelines

15  are at Page 7 of their sentencing memorandum, and then they

16  make a recommendation beginning at Page 9.

17          **MS. PELOQUIN:**  Yes.

18          **THE COURT:**  I didn't get an objection -- I didn't see

19  an objection at least to these calculations.

20      Are you in agreement that these calculations at least are

21  correct?

22          **MS. PELOQUIN:**  Yes, Your Honor.

23          **THE COURT:**  Okay.  The second question has to do with

24  the number of times he consulted with a psychiatrist or

25  psychologist while in custody.

1          It appears, from the chronos, that he was in fairly

2    regular contact while he was in the Bureau of Prisons with

3    both -- well, I don't know if it was the psychiatrist or

4    psychologist.  I didn't get those reports -- but some -- some

5    form of mental health personnel.

6          And there's a number of chronos that indicate rather

7    consistently, over the long time that he's been in custody,

8    he's had the ability to -- to speak to people and talk to them

9    about what he's feeling.

10         Do you acknowledge that?

11         MS. PELOQUIN:  Yes, Your Honor.  Yeah.  I think --

12   that certainly has been the case.  I think there are some

13   things that have changed in the last few years.  One -- one of

14   them is simply that Mr. Shofler has gotten older.  I think he

15   would candidly tell you that, in his 20s --

16         THE COURT:  That's true, but the graph doesn't help

17   him.  You saw the graph in Dr. Badre's report about how

18   criminality and possible violent behavior starts to drop off as

19   one ages?  And he's absolutely an exception to that.

20         He's, what, 46 now?

21         MS. PELOQUIN:  That's correct, Your Honor.

22         THE COURT:  Yeah.

23         And -- and yet, you know, violent conduct has continued

24   way beyond the period, according to the graph, where it drops

25   off with most similarly situated male adults.

1          **MS. PELOQUIN:**  And, Your Honor, I think what I would

2     say to that is that, to some degree, we have to look at the

3     environments in which Mr. Shofler has been in, which -- you

4     know, the USP's -- he's been, I think, at ADX at some point.

5     He's been in solitary confinement for many, many years.

6          These are --

7          **THE COURT:**  He's here, though, Ms. Peloquin, you have

8     to acknowledge, not having anything to do with the culture of

9     the prison.  He's in a bank, waiting in line, and he gets

10    aggravated because a teller, quite rightly, tells him, "Look,

11    you don't have an established track record here.  We can't cash

12    this check for you right now."

13         And he gets furious and threatens to kill the teller and

14    kill the teller's family and then gets in a scuffle with a

15    customer who's in line and has to be choked out and restrained.

16    That had nothing to do with the prison atmosphere, you know,

17    triggering that.

18         **MS. PELOQUIN:**  I agree, Your Honor.  However, I think

19    what I would say to that is that his, you know -- where he was

20    socialized from a very young age and what he has mostly

21    experienced -- those are all the types of behaviors that people

22    would engage in.

23         And so I agree that that is a concern in this particular

24    case, but that's why I'm suggesting that what he needs is this

25    ability to step down both into a program that has wraparound

1    services and then into a place where he has a great interest,

2    at Palomar College, and where they are accustomed to dealing

3    with individuals who have the type of history that Mr. Shofler

4    has because I think, you know, ultimately, the part of it that

5    we have been missing is that Mr. Shofler, when he was

6    socialized -- right? -- that in -- in a circumstance in which

7    you have a disagreement with somebody else, this is how you

8    solve it in prison --

9            **THE COURT:**  Hmm.

10           **MS. PELOQUIN:**  -- right?

11       If you're just released after spending 30 years in prison

12   from the time you were 16, pretty much, with short periods of

13   being released up until you're in your 30s, you don't have

14   other coping strategies.  The rest of us, you know, had to

15   learn those coping strategies as we matured, as we were

16   teenagers.

17       You know, you may have had an outburst.  You realized that

18   was not the way to, you know, move forward.  You learned to

19   keep your emotions in check and to deal with things in a better

20   way.  That hasn't really been the experience that Mr. Shofler

21   has had, and I don't say that to excuse that behavior.  My

22   suggestion is just that I don't think that that behavior will

23   be cured by sending him back to a USP.

24       And -- and so my -- my concern is, you know, eventually,

25   at the end of the day, he is going to have another chance to be

1  released into -- into the world.  And the question is whether

2  we're going to have somebody who's stable, who has, you know,

3  all of the services, hopefully, that he'll need and who's sort

4  of plugged into --

5          THE COURT:  Pardon me.

6          MS. PELOQUIN:  -- goals -- right? -- that he wants for

7  himself, which is also something that has changed over time.

8  In his 20s and his 30s, I don't think Mr. Shofler cared very

9  much for his own life or for anything else.

10         THE COURT:  I didn't see anything in the reports that

11 showed he availed himself of any prison programming.  Did he do

12 so?

13         MS. PELOQUIN:  Mr. Shofler, I think, was mainly in

14 solitary confinement for a long time.  I don't believe that

15 there were many prison programs that were available to him.

16         THE COURT:  Because of his custody status?

17         MS. PELOQUIN:  Correct, Your Honor.

18         THE COURT:  Which was a result of him misbehaving in

19 custody?

20         MS. PELOQUIN:  And also as a result of the conviction.

21         THE COURT:  There was an allusion to him being part of

22 the Aryan Brotherhood while he was in custody.

23     Does he acknowledge that, that he was part of that group

24 while he was in custody?

25         MS. PELOQUIN:  Yes, Your Honor.  I think he -- you

1  know, at the end of the day, he's white, and he was in federal

2  prison.  And, you know, you have to join a team, and there were

3  no other teams available to him.

4        **THE COURT:**  Hmm.

5        **MS. PELOQUIN:**  But I can tell you that my experience

6  with Mr. Shofler over the last two years -- he's always been

7  respectful.  He has been kind.  He has been appreciative of my

8  work.  We have discussed that -- he doesn't have any tattoos or

9  anything like that.  We've discussed that association.

10      In fact, one of the very first things that he said to me,

11  I think, maybe on our first visit, was that he -- you know, he

12  absolutely rejects racism.  He abhors it.  He'd hoped he -- he

13  was very concerned that I would not wish to work with him.

14        **THE COURT:**  Hmm.

15        **MS. PELOQUIN:**  And that was for, I think, a long

16  period that we were working together, was that he was feeling

17  that -- that perhaps I would not trust that he could be a good

18  person.

19      And so I can tell Your Honor that I have in no way

20  experienced anything that would lead me to believe that that's

21  something that would be a problem for Mr. Shofler.  I think --

22  you know, we've gotten -- gotten on very well.  I think he will

23  be fine on a diverse campus.

24      Those are not -- those are not values that -- that I think

25  that he holds at all.  I think that that's just somebody who

1   was young and, you know, was in custody for a long time, and

2   that's part of what you have to do to survive.

3           **THE COURT:**  Hmm.

4           **MS. PELOQUIN:**  So for what it's worth.

5           **THE COURT:**  All right.  Anything else?

6           **MS. PELOQUIN:**  No, Your Honor.

7           **THE COURT:**  Mr. Shofler, you have an opportunity to

8   address me and tell me anything else you want me to know.

9       You can remain seated, and we'll just push the mic in

10  front of you, but I'm happy to hear from you.

11          **THE DEFENDANT:**  Okay.  I appreciate her -- her

12  thoughts and her -- her efforts that she's given forth today.

13      I'm ready to begin a new part in life, you know, and this

14  is something that I've been going towards for the last several

15  years.  And I'm willing to do the work that it takes to -- to

16  achieve my goals, and I'm looking forward to an opportunity to

17  do so.

18      I have been in custody for a long time.  I'm familiar with

19  that life.  I regret my behavior at the bank.  It was

20  inappropriate.  You know, it should never have happened, and it

21  was wrong on my part.  And since that time, and every day, I

22  try to be positive.  I try to -- to -- to learn something, to

23  do something productive.

24      I have not had opportunities in -- while I was

25  incarcerated for programs because I was in solitary, and they

1   don't provide those programs.  I would have availed myself of

2   that and education if that would have been available, and it

3   had not been.  I really, really look forward to going to

4   college, and I want that so much.

5         And -- I'm real nervous right now.  So that's -- but

6   Ms. Peloquin is right.  I don't have those values.  I don't

7   think in certain ways that are criminal ways.  I reject those

8   values, and I do so every day, and I hope to -- to have a new

9   life, to have a new start and a new path.

10         And until recently, it hasn't really been clear to me, and

11   I'm -- the colleges and I see a path forward, you know?  And

12   before that, I was just kind of drifting, and now I kind of see

13   a definitive path forward:  Go to college, to work, and take my

14   time to -- to achieve my goals, to be a better person.

15         And I'm -- regardless of what happens here, I intend to go

16   to college, and I hope that I can do so before I get too much

17   older.  I am -- I am now at an age now where I'm -- I'm a lot

18   different than I was when I was in my 20s and even in my 30s.

19   I am at a stage in my life where I have mellowed out a whole

20   lot, I mean, tremendously.

21         I have had a few minor incidences in the last couple

22   years.  They've been minor.  They've been relatively

23   situational.  But 99.99 percent of the time, I'm -- I'm -- I'm

24   positive.  I'm smiling.  I'm trying to -- to encourage other

25   people to be positive that are around me.

1      I really look forward to going to college and being maybe

2  an example for other people someday down the road, where they

3  can see, hey, you know, you didn't have a good start, but it

4  was never too late, you know?  And that's how I feel.  It's

5  never too late, you know?

6      Like, I -- I'll be in my -- hopefully in my early 50s

7  working on a master's degree or a Ph.D., and I look forward to

8  it, and it's better to be at that age than never to have done

9  it.  And so I -- I feel really, really enthused about it.  I

10 feel very excited to have that opportunity.

11     And I think Ms. Peloquin is right.  I mean, I wanted time

12 served.  She wants the -- the - to give the Court the

13 opportunity to -- for me to speak with you and say, look, if I,

14 in any kind of way, don't cross my T's or dot my I's, you throw

15 the hammer on me.  I understand that, and you have every right

16 to do so.

17     And I just want the opportunity to -- to show you, to show

18 the Court, show Probation, and show the Government that -- that

19 I can succeed, and I can be a positive influence and be a

20 positive contributor to -- to my environment, and I don't have

21 to be just incarcerated.  I mean, I can -- I can actually

22 contribute.

23     I like helping people.  I'm -- I am intelligent.  I do

24 like to learn.  I like -- I like languages, as they know.

25 Like, I like to read literature.  I like to write.  I'm writing

1  more and more every day, you know, creating fiction and poetry

2  and stuff.  I continue to do that.

3      I kind of see, if I go to college, that I can be around

4  other people with like minds, and I can learn from them, and

5  that I can contribute and -- and speak with these people.  And

6  to be -- to be formally a part of -- of an academic group is

7  something that -- that I have, in my dreams, dreamed about.

8  And -- and it's here, and it's -- and it's available now,

9  and -- and I'm ready for it.

10     And I -- I'll leave it at that, you know?

11         **THE COURT:**  All right.  Thank you.

12     Ms. Prewitt, on behalf of the United States?

13         **MS. PREWITT:**  Your Honor, the defendant is not someone

14  that we see very often in this court.  He is an individual who

15  has been in near continuous custody since the age of 16.  His

16  longest period that he's been released from custody, since the

17  age of 16, was for seven months.  And that was in 1995 to 1996,

18  over two decades ago.

19     He entered the federal system in 1997, based on bank

20  robbery, and then he picked up two more federal convictions,

21  serious federal convictions, while in custody.  Once he was

22  finally released from federal custody in 2015, as Your Honor is

23  aware, less than three months later, he's in a bank in

24  Escondido, while on supervised release, threatening to kill

25  others.

1      This is not only a serious breach of the Court's trust,

2  but it's even made more serious because it's continuing the

3  violence and the danger to others that got him into federal

4  custody in the first place.

5      As the Court is also aware, based on Dr. Badre's report,

6  his history of violence, threats, and fights has continued

7  almost nonstop since he has been in custody.  And that has been

8  true even once Mr. Shofler was brought into the federal system

9  in 2021 in order to face the three petitions that we're here

10  for today.

11      In Dr. Badre's report, Pages 13 through 16 is where he

12  lays out some of the significant incidences that Mr. Shofler

13  has had while in custody.  I'll just point out a couple.

14      In May of 2022, he was in a fight in which he threatened

15  staff and called another staff member a wetback.  In June of

16  2022, he threatened and insulted an officer, including biting

17  that officer.  Also, that same month, he told a doctor that, "I

18  continuously think of ways to kill others."  Based on this

19  behavior, he, of course, has been in segregation while awaiting

20  sentencing on these petitions.

21      So I'm going to strenuously fight back at any notion that

22  the problems that he has recently have been minor incidences.

23  These are not minor incidences.  These are the exact types of

24  behavior that got him here in the first place, and it's

25  concerning that, while facing sentencing on these three

 1   petitions, he's continued this violent and dangerous behavior.

 2   The United States is concerned, as is Dr. Badre, that this is

 3   likely to continue once he is released from custody.

 4       I understand Ms. Peloquin's argument that Mr. Shofler is

 5   someone who is going to be released one day.  I think the

 6   critical question for the Court is whether the 3553(a) factors

 7   counsel that he should get a break from the guidelines and be

 8   released now or whether he is deserving of a guideline sentence

 9   and should be -- receive the sentence that the United States is

10   advocating for.

11       I would also just underscore -- I know that this is a

12   battle of the experts, but I think that it's an important point

13   to note that Dr. Badre believes that Mr. Shofler does not

14   suffer from a psychotic or mental disorder.  Rather, he suffers

15   from a personality disorder, meaning that Dr. -- or meaning

16   that the defendant has every ability to make right and rational

17   decisions but continually chooses not to do so.  That's a

18   dangerous individual.

19       And the hope that Dr. Badre has is that, by spending

20   additional time in custody, perhaps we can get to kind of a

21   more critical age where he'll realize that he can't continue

22   this behavior, that he'll turn from this behavior, and that, in

23   doing so, it will reflect the seriousness of the breach of the

24   Court's trust so that when he is released from custody -- the

25   United States is asking that he be released with two years

remaining on supervised release -- that we won't see this kind

of behavior again.

And if we do, he'll be right back in here, facing serious

and critical time in additional federal custody.

**THE COURT:**  Probation have anything to add?

**THE PROBATION OFFICER:**  Just a few thoughts,

Your Honor.  Craig Bilinski for United States Probation.

Your Honor, I -- my -- my presentation to the Court won't

be as eloquent as the defense --

**THE COURT:**  Speak into the mic.

**THE PROBATION OFFICER:**  My presentation to the Court

won't be as eloquent as the defense and the United States

Attorney's Office.  However, I will just say, Your Honor, to

start off, that every risk predictor or assessment that uses --

that's used past behavior is one of the best predictors of

future behavior.

With that said, and going back to one of the comments that

Ms. Peloquin started her proposal to the Court, relative to her

recommendation, is to hold this sentencing in abeyance and

allow Mr. Shofler to be released to the street to basically

prove whether or not he's going to stay in compliance.

And my thought on that is, you know, at what risk

measurement or assessment do we use to really weigh out and

balance protecting the community from further incidences that

took place in the bank versus, you know, holding this in

abeyance -- in abeyance to see if, indeed, he's -- he's going
to prove himself not to be able to do that?

As the U.S. Attorney's Office pointed out, he was living
with his mother, his sister, his brother-in-law at the time
that that incident occurred in the bank.  He committed that
incident in the presence of his mother.  I don't know if
Your Honor has been able to see the video.

**THE COURT:**  No.  I didn't see the video --

**THE PROBATION OFFICER:**  Yeah.

**THE COURT:**  -- but I was aware that his mother tried
to intervene at one point --

**THE PROBATION OFFICER:**  Yes.

**THE COURT:**  -- and saw at least part of it.  It was
sort of -- the whole thing?

**THE PROBATION OFFICER:**  Multiple times.  Multiple
times, yes.  Yes, Your Honor.

**THE COURT:**  Yeah.

**THE PROBATION OFFICER:**  So for me, from Probation's
standpoint, how are we going to structure a plan?  Because this
is going to be about continuing behavior, Your Honor.

If, indeed, he suffers from a personality disorder, what
that equates to is that there is no amount of substance abuse
treatment or mental health treatment that's going to be able to
impress upon him the need to change his behavior because
that -- these are his own decisions.

1   And to suggest that his exposure to multiple years of

2   confinement led him to perhaps engage in that behavior at the

3   bank, I don't agree with that, Your Honor.

4   As Your Honor is aware, I've supervised offenders from the

5   West Coast to the East Coast to the in-between.  I've

6   supervised offenders with 20, 30, 35 years of custodial

7   sanctions that get out and adjust very well.  These are --

8   these are decisions that he's making on his own.

9   And another dynamic of this whole thing -- to openly admit

10   that you are associating with the Aryan Brotherhood -- as

11   Your Honor is aware, that is not a political team.  That is a

12   disruptive group in the Bureau of Prisons.  That is a

13   blood-in/blood-out gang.  So you need to shed blood to get in,

14   and you're only going to shed blood to get out, which is -- as

15   we know, it results in the death of an AB member attempting to

16   get out.

17   So now, not only do we have this -- this behavior that

18   we're dealing with over and over again, repetitively,

19   throughout his incarceration, now we have another dynamic

20   factor that we need to take into consideration if we're going

21   to kind of build a containment model for supervision.  To

22   suggest that, at this point, holding anything in abeyance and

23   releasing him to the street doesn't give Probation any time to

24   come up with a plan like that.

25   However, with that said, Probation does concur with the

1  written memo that was -- that was submitted by the

2  U.S. Attorney's Office relative to the custodial sanction and

3  subsequent supervised release.

4        **THE COURT:**  Okay.  Thank you very much.

5        **THE PROBATION OFFICER:**  Thank you, Your Honor.

6        **MS. PELOQUIN:**  May I respond briefly, Your Honor?

7        **THE COURT:**  Yes, of course.

8        **MS. PELOQUIN:**  Your Honor, just to be clear, I'm not

9  proposing that Mr. Shofler be released to the street or even to

10 go home with his family.

11       What we have spoken about with the Government and also

12 with Officer Bilinski is that, in fact, we had found a program

13 that had a dual-diagnosis program that would do alcohol

14 treatment and also mental health treatment.  We discussed and

15 presented that program to Officer Bilinski.  He suggested a

16 different program, and so we went and had him do intake for

17 that program.

18       So he has been accepted into that program, and we haven't

19 requested a bed space.  We had one earlier in the spring, when

20 we were originally set to go forward with sentencing, but

21 knowing that things had been delayed -- but he has been

22 accepted into that program.  And so it's not, in any way, our

23 intention to have him released to the street or to go home with

24 his sister.

25       I think what he really does need is a step down from

custody, to go to a place where there are individuals and where

he can have wraparound mental health treatment and also

substance abuse treatment and also reentry treatment.  And

that's something we discussed with Probation before we chose

the program, which is Casa Raphael, which is, I think, part of

the Alpha Project, which was suggested by Officer Bilinski.  So

I'm not suggesting he walks out on the street today or tomorrow

or any time, you know, in the near future.

The other thing I just wanted to point out, Your Honor, is

that, for many years, Mr. Shofler --

**THE COURT:**  I'm sorry.  I missed the first part of

what you just said.

**MS. PELOQUIN:**  Oh.  I'm sorry.

One other thing I wanted to point out was that Mr. Shofler

has been taking mental health medications.  He's been taking,

you know, antipsychotics.  He's been taking antidepressants.

You know, he's been taking antianxiety medication.  And I

think, right now, he's in a place where he's -- he feels that

that has really helped him.

On and off, over the years, he's taken medication.  He's

gone off medication.  I know that's a cycle that the Court sees

often with individuals who have mental health problems, but

what I want to underscore is this.  Obviously, one of the

questions here is whether Mr. Shofler has a personality

disorder or whether he has mental health problems that can be

 1    treated and which he should get treatment for.

 2         And I just want to point out that, you know, we don't

 3    prescribe medications for individuals who have antisocial

 4    personality disorder.  Doctors are prescribing this medication

 5    that's indicated for Mr. Shofler, and many of these, you know,

 6    different diagnoses or -- or indications have overlapping, you

 7    know, behavioral traits that people might see.

 8         And I think Dr. Kirschenbaum is correct to point out that,

 9    you know, bipolar disorder doesn't usually become sort of

10    full-blown and diagnosable until a person is in -- you know,

11    sort of in their mid-20s or longer.

12         And so, obviously, there's going to have been things that

13    have been coming to the surface over time that may have been,

14    you know, mistaken for something else.  But ultimately, I

15    think, at this point, the fact that he's taking medications --

16    that it has helped him in terms of his mental state.

17         And then the last thing I'd point out, just with respect

18    to the psychologist reports, are just, you know, obviously,

19    Dr. Badre chose a -- a test that is not even remotely the most

20    recent test.

21         **THE COURT:**  You're talking about the MMPI?

22         **MS. PELOQUIN:**  Correct, Your Honor.

23         And it includes a correction that, at this point, has been

24    disregarded by the updated versions of the MMPI.  And if you

25    remove that correction -- well, there's -- I think the thrust

1  of it is kind of three things.  One, it's -- it's not even the

2  second most recent version of the MMPI.  There's -- there's two

3  more recent versions than the one that Dr. Badre employed.

4      The correction that is employed by the MMPI-2 is one that

5  has been abandoned in the subsequent MMPIs, and that correction

6  is what elevates the scale for antisocial personality disorder.

7  And Dr. Kirschenbaum, when she removed that correction, even

8  with the MMPI-2 removing that correction, which doesn't exist

9  anymore, that has been abandoned --

10         **THE COURT:**  Hmm.

11         **MS. PELOQUIN:**  -- put his score in a -- in a normal

12 range.

13     The other thing is that, obviously, his score most likely

14 was invalid because he's guarded, and I do want to address

15 that.  Mr. Shofler obviously knows that the -- the purpose of,

16 you know, being evaluated for the Court and answering these

17 questions is to sort of show that he's not a monster --

18 right? -- that he does -- that he's not broken, that he can't

19 be -- you know, that he's not somebody who can't be fixed.

20     And I think he certainly did deny symptoms that he

21 actually has in an effort to try to make himself look better.

22 And I don't think that that's because, you know, he wants to be

23 not candid with the Court.  It's because he wants to put

24 himself forward in the best light, which is understandable.

25 Because he was so guarded and he didn't necessarily, I think,

1  agree with symptoms that he -- he has, it's hard to interpret

2  those results.

3       And so coming to the conclusion that he has antisocial

4  personality disorder or borderline personality disorder or what

5  have you, based on an outdated test with an invalid correction

6  that nobody uses anymore and based on an invalid score, and

7  then not doing subsequent testing -- there were other

8  personality tests that Dr. Badre could have employed afterwards

9  to sort of check and see what was going on.

10       And the last thing I will leave you with, Your Honor, is

11  that, although the MMPI, you know, is a psychological test

12  that's employed, it's not intended to diagnose mental health

13  disorders.  It -- it's a personality test.  At the end of it,

14  it will give the examiner some possible diagnoses to rule out

15  or to consider.

16       But it is not a test that, in and of itself, says, "This

17  person has bipolar disorder" or "This person has

18  schizophrenia."  It will just say, "Here are some things that

19  you should consider and investigate further."

20       **THE COURT:**  Uh-huh.

21       **MS. PELOQUIN:**  So we have an old test with an invalid

22  correction that is not a diagnostic test.  It doesn't

23  determine -- that's not how you determine whether somebody has

24  bipolar disorder.

25       And, again, at the end of the day, there are doctors who

1    have, you know, been seeing Mr. Shofler, who have been

2    prescribing him medications consistent with his diagnoses of

3    depression and bipolar disorder, and those -- those medications

4    have helped Mr. Shofler.

5         He is also willing -- and I think we included in our

6    sentencing papers he is willing to, if it can become available

7    to him, take a program in which he would get injectable

8    medication, the long-acting injectables that last a month at a

9    time, so that we're not dependent on making sure that he takes

10   his medications every day.

11        That -- you know, basically, there are these long-acting

12   injectables that I think nurses administer, and he can go once

13   a month and have -- have that medication administered in that

14   way.  I think that that offers as an extra safeguard that he

15   will be medicated appropriately.

16        And so I'd ask the Court to consider the fact that

17   Mr. Shofler has come to a point in his life where that's

18   something he's -- he's willing to do because he understands

19   that medication has improved his life, that it allows him to be

20   less ruled by some of the turmoil that -- that he has inside

21   and to be able to be more productive and improve his life.

22        So I'd ask the Court to consider those things.

23        **THE COURT:**  All right.  Thank you, Ms. Peloquin.

24        If you'll give me just a minute, I want to look at the CV

25   of Dr. Kirschenbaum.

1        Ms. Peloquin, do you know offhand what percentage of

2   Dr. Kirschenbaum's work is in the forensic field?  She lists

3   that she is in private practice as a clinical psychologist in

4   Beverly Hills, that she has been employed there in that

5   capacity from 2017 to 20- -- or to the present time.

6        I understand that most forensic psychiatrists and

7   psychologists don't do that exclusively.  They have a clinical

8   practice on the side, but do you know what the percentage of

9   her clinical practice is versus the forensic work that she's

10  done?

11       **MS. PELOQUIN:**  I believe -- I don't know the exact

12  percentage, but I believe that a large percentage of her

13  practice is in forensic practice.  I know, for example, that

14  she is on the list in San Diego.

15       So she -- I think she goes back and forth between

16  San Diego and Los Angeles, and she also teaches with Dr. Badre

17  at UCSD as well.  They -- they also have an academic

18  professional relationship, but --

19       **THE COURT:**  She's listed that she's a panel member in

20  Los Angeles.  She hasn't listed San Diego.

21       You say she also is here?

22       **MS. PELOQUIN:**  I believe she is a panel member on --

23  in San Diego -- for the -- the court here in San Diego.

24       **THE COURT:**  Is this --

25       **MS. PELOQUIN:**  I don't believe --

1        **THE COURT:**  Is this the most current CV?

2        **MS. PELOQUIN:**  That is the one that I have.  I know,

3  in speaking to her and preparing -- expecting her potentially

4  to testify -- I don't believe she -- I'm not sure that she has

5  ever been called to provide a report to the court in San Diego,

6  but I believe she is on the panel.  She's one of the available

7  experts.  She worked as a clinician in jails for a long period

8  of time.  She did a long forensic internship.

9      She works at a program that was part of, I think, the Los

10  Angeles courts, in which they -- she worked with individuals

11  who had very serious mental illnesses, who were in the court

12  system, and worked sort of towards stepping them down from

13  jail, where, you know, their mental health considerations

14  were -- well, where their mental health was at -- not improving

15  by being in custody and sort of helping them go through kind of

16  hospitalization and then programming and then sort of out into

17  the community.  These were individuals who had been deemed, I

18  think, incompetent, essentially, with very, very high mental

19  health concerns and needs.

20      She's also worked, I believe, in the County Jail.  She's

21  worked in, you know, prisons.

22        **THE COURT:**  Uh-huh.

23        **MS. PELOQUIN:**  That's -- you know, in speaking with

24  her and in preparing for her testimony, she spoke a lot about

25  that work, and I know she continues to do that work to this

1 day.

2  So -- and, in fact, I believe the class that she was going

3 to teach for Dr. Badre is about forensic psychology and

4 essentially evaluations and -- of individuals who are in

5 custody.  So --

6   **THE COURT:**  Okay.  All right.  Thank you.

7  Well, the Court has now had an opportunity also to review

8 the CV of Dr. Kirschenbaum.  I looked at it carefully.

9 Ms. Peloquin has provided some additional information about her

10 background and training.

11  Let me start by saying this.  At best, I think the

12 diagnosis of personality disorder is an inexact science.

13 That's been my experience as a lawyer.  It's been my experience

14 as a judge.  A lot of times, it's dependent upon psychological

15 tests, and I think it's hard for many people to see the

16 relevance of some of those tests.

17  Now, I'm speaking as a layperson, not an expert, but I can

18 remember versions of the MMPI that asked what I thought were

19 absolutely irrelevant questions.  "I enjoy repairing a door

20 latch.  My table manners are as good at home as they are when I

21 go out to a restaurant."

22  And I think, you know, everyday people who sit on juries

23 scratch their heads and say, "What does that have to do with

24 this fellow is going to be violent going forward or whether,"

25 you know, in a post-diction analysis, "he had a certain frame

of mind the year before, when he committed the crime that he's
charged with?"

So I bring that experience to this.  I don't want to
characterize it as a bias.  I was open-minded as I looked at
these things.  Let me say that I find that both of the experts
are qualified, but looking comparatively, I find Dr. Badre to
be more qualified.

First, of course, he's a medical doctor, which, to me, and
from experience, I know, signifies additional training beyond
that than someone who has a Ph.D. -- or in this case, I think
it's the equivalent of a Ph.D.  She describes it as a Psy.D.,
but in all events, a doctor of psychology.

So I find that, in that respect, Dr. Badre is -- is likely
more qualified, given the additional training that he's had.  I
also looked over the respective CV's of both, and Dr. Badre has
done many more publications, peer-reviewed work.  So I do find,
on balance, that he's probably the more qualified of the two.

But, again, it's not -- the -- the comparison that I make
is not enough to be dispositive of what ought to happen here
because, as I said, I respect both.  I think both probably did
their best to put forward their good-faith opinions.

I will say this.  I found Dr. Kirschenbaum's report to be
defensive in a number of instances where she chronicled that
Mr. Shofler had been diagnosed -- or there was an allusion to
antisocial behavior.  She criticized those in each -- each

 1  case.  It wasn't apparent to me that, other than having, you

 2  know, what the conclusion was -- that she made any effort to

 3  reach out and find out what the reasons were or contact the

 4  person that did that -- that reached that diagnosis.

 5      Who knows if the person was still available.  But before

 6  you get to the point of critiquing it, saying it's absolutely

 7  wrong, looking at a sliver of information, I think it would be

 8  incumbent upon you, to maintain objectivity, to say, "I tried

 9  to contact this person, you know, to go over it because I had

10  some questions about this, and I question the diagnosis."

11      There are multiple times that the word "antisocial

12  personality" comes up in his background of being seen by mental

13  health professionals in the prison system, and I just -- I felt

14  like the report of Dr. Kirschenbaum was more defensive and

15  adversarial than objective in dealing with those.  It was as if

16  she was trying to make an excuse every time that word came up

17  or that diagnosis came up.

18      So those are just some preliminary remarks about my

19  comparative review of the two reports.

20      I think Mr. Bilinski said it best when he said, "Look,

21  it's not so much what a person says.  It's what a person does

22  that is the better predictor of future behavior."  I have a lot

23  of respect for Mr. Bilinski.  He's been before me for years.

24  He knows whatever he speaks because he has, as he said, dealt

25  with a lot of people with long or violent records.

1     And I think he's -- he's very capable of making

2   assessments.  While not a clinician, while not a Ph.D. or a

3   medical doctor, he has on-the-ground experience in supervising

4   these people.  And I think, at least from my lay perspective,

5   I'm willing to trust his judgment equally with that of the

6   prognosticators that have degrees because he's seen hundreds of

7   cases and has learned from that experience.

8     The concern I have, at this point, is with releasing

9   Mr. Shofler into a program.  You know, he wants to go to

10  Palomar.  He's sincere about that, seems sincere.  But the

11  problem -- the problem is that he hasn't done the kinds of

12  things, even leading up to this hearing today, even leading up

13  to the announcement of judgment in this case, that shows me

14  that he's ready to do that.

15     And I have to tell you, Ms. Peloquin, I'm fearful that

16  there would be blow-up in a class.  You know, as you were

17  telling me and he was telling me about his aspirations, I

18  thought to myself, "Does Palomar really want to take this

19  risk?"  I mean, do they really want to let this fellow in

20  who -- you know, a triggered temper like this and is fighting

21  and antagonistic toward people?

22     I don't know what the civil ramifications of that are.

23  They -- you said they know his background --

24          MS. PELOQUIN:  Yes, Your Honor.  It's --

25          THE COURT:  -- and they're willing to have him mix

1    with other people, and are they going to warn the other people

2    in the class that, "We've got a guy who's been" -- "had a

3    history of great violence.  So don't say anything controversial

4    that he might disagree with because you might set him off"?

5    That -- these are just things that I'm -- I'm worried about.

6        I think, you know, one has to earn trust, and he hasn't

7    done that.  He just hasn't.  When you look at the totality of

8    his criminal record and, as the prosecutor points out, how long

9    he's been out in the periods where he's been paroled or he's

10   been released, he invariably gets back into trouble, and the

11   trouble usually is in the nature of violence and violent

12   threats.

13       This most recent triggering incident wasn't an aberration.

14   I mean, it just wasn't.  He kills a cellmate, and then he

15   attacks another prisoner, who apparently testified against him.

16   I don't know if it was in relation to the murder or some other

17   incident.  But there's -- there's a history of violence and

18   violent threats, and it continues on, even as he awaits, as I

19   said, the announcement of judgment here.

20       You know, he's threatening jail guards, and he's making

21   statements that, you know, I would consider threatening.

22   Forget about the stuff -- you know, calling somebody a wetback

23   or whatever.  I'm not that worried about that.

24       But I would think that if -- if, as you say, as you

25   advocate -- that he's really ready to go out and turn a new

1    leaf in his life, pursue a college degree, a master's, a Ph.D.,

2    that he would begin to demonstrate that during this trial

3    period, while he's been in custody for this very -- these very

4    violations, and yet he's done the opposite.

5         I mean, I look over the chronicle of the incidents, and

6    there's a -- there's a bunch of them.  He just -- he can't

7    behave, and you're asking me to trust him with a track record

8    like that.  I just can't do that.  I don't trust him.

9         I agree with -- with the probation officer, Mr. Bilinski,

10   that you earn trust by -- by demonstrating that you deserve it,

11   and -- and he hasn't done that.  He's -- he's not done that.

12   He's done just the opposite.  He's engaged in the same kind of

13   behavior.

14        As far as the diagnosis is concerned, I put much less

15   importance on the psychological test as I do of the diagnostic

16   criteria in DSM-V, again, not a clinician.  And I -- you know,

17   I'll admit that I've always been somewhat skeptical of people

18   engaged in this post-diction analysis or what was on somebody's

19   mind, you know, a year ago.  The person maybe can tell us that.

20   Maybe God knows.  But who else beyond -- beyond that?  So I've

21   always been fairly skeptical of it.

22        But, you know, accepting both the -- the reports here, I

23   find that the facts and circumstances that are undisputed in

24   this case support Dr. Badre's conclusion that this is a

25   personality disorder.  He meets the criteria for antisocial

1   personality disorder almost to a tee.

2       Now, like I said, to the extent, you know, one gives great

3   credit to these things and is guided by this -- I understand

4   that this is the Bible for mental health professionals,

5   forensic psychiatrists and psychologists.  They rely on it to a

6   great extent.

7       I often wonder, would it pass the *Daubert* analysis?  You

8   know, is it peer-reviewed?  Is there empirical evidence that

9   supports the conclusions that we allow psychiatrists to make?

10  I'm not sure about that.  And that cuts both ways here because

11  we have two different -- you know, two different mental health

12  professionals giving us a diagnosis.

13      But I wonder, you know, is this -- is this testable?  You

14  know, is there a track record that supports it like -- like

15  other sciences that experts are allowed to testify to?  It's an

16  open question, all that to say I haven't put great reliance on

17  either the diagnosis or the testing results.

18      Instead, I'm -- I'm relying primarily on my own

19  experience.  I've been at this now for, what, 40- -- 44, 45

20  years, was a criminal lawyer for a long time, been a judge now,

21  like, 20- -- 26 years, I think -- yeah, about 26 years -- and

22  I've had an opportunity to evaluate a number of defendants.  I

23  don't -- I don't think I tilt one way or the other.  I mean, I

24  was open-minded to this.

25      And, certainly, there are a lot of people who have shown

promise, and then I accept what they tell me in their

allocution.  But here, as I said, the objective facts -- his

behavior over the long run, and even over the short run, has

not backed up what he says.  It doesn't back up his

aspirations.  If he really -- if he really means -- Mr.

Shofler, let me talk to you directly.

     If you really mean what you say, then I would have

expected that the behavior coming into this hearing over the

last two years and, in particular, while you've been in federal

custody, awaiting this hearing, would have been exemplary.

There wouldn't have been any mouthing off to guards.  There

wouldn't have been any threats, nothing like that, no

altercations, no being pushed downstairs, nothing.

     You would have, you know, stayed away from all of that,

made an effort to point to a track record, when you got here

two years later, and said, "Judge, look" -- you know, "I know

it's been bad for the first 30 years, but look" -- "look at my

record during these last two years.  It's been exemplary.

I" -- you know, "I haven't gotten into any trouble.  I haven't

threatened anybody."

     But that's -- that's not -- that's not the case.

          **THE DEFENDANT:**  And you're correct in doing so and me

saying so.  I do vigorously dispute the comments that were

alleged that I had made.  I did not make those comments.

Spanish is one of my languages -- excuse me.

1          **THE COURT:**  I gave that -- Mr. Shofler, listen, I

2     don't -- or, Mr. Shofler, I don't want you to think that, you

3     know, I'm driven by that.  As you heard me say --

4          **THE DEFENDANT:**  They're simply not true.

5          **THE COURT:**  Okay.  I discounted that anyway.  I'm

6     talking more about, you know, the threats to other people,

7     the -- the altercations with people and with guards.

8          I mean, I wondered to myself, "What was he doing that he

9     got pushed down the stairs?"  You don't look like an easy

10    target to me.  So there must have been some back-and-forth that

11    led to that, and it -- it just corresponds to this continuing

12    pattern of violence and violent threats by you.

13         And, again, I don't say these things to make you feel bad,

14    but I'm trying to look objectively at this record and make a

15    projection, based on experience and common sense, taking into

16    account what everybody else says.  What's likely to happen?  I

17    think, honestly, at this point, what's likely to happen is

18    you'll have another episode, and I would hope -- I would hope

19    it wouldn't happen in -- in a class.

20         I mean, who would have thought that, in the presence of

21    your mother, it would have happened in a bank over something as

22    menial as whether they're willing to immediately cash a check

23    for you as opposed to let you deposit it and let it sit there

24    for ten days and then come back and withdraw the money?  I

25    wouldn't have thought that that would have led to an issue

1   where you get convicted of a felony, and you're threatening to

2   kill not only the teller but the teller's family.

3        So I don't think the -- objectively speaking, I don't

4   think the backing is here that he's not dangerous, which leads

5   me to the 3553 factors.

6        I agree with the Government's analysis that, of the ten

7   factors, two don't apply at this supervised release hearing.

8   I'm not trying to punish him anymore.  I mean, he's been

9   punished by the State for the episode in the bank.  That's not

10  part of my agenda here.  It cannot be because it's prohibited

11  by the standards for evaluating whether a sanction is

12  appropriate.

13       I'm not trying to promote respect for the law, but I am

14  concerned about the community.  And, Ms. Peloquin, you say,

15  "Well, you know, what good does it do to institutionalize him,

16  you know, forever and ever?  At some point, he's going to get

17  out."

18       Yeah, he is.  But I'm worried that if he gets out in the

19  short run, there will be another violent incident that may

20  result in somebody else being choked out, somebody else being

21  harmed, not him.  And, you know, he's shown a tendency to -- to

22  recidivate -- recidivate.

23       And -- and, again, with violence and violent threats and

24  the like, I just think he's a -- he's a danger to the

25  community.  I think it would be irresponsible, at this point,

1  for me to say, "Yeah.  Well, I'm going to send you into a

2  college class at Palomar with, you know, no guards around you."

3  Today, you know, I know even -- there's concern about him today

4  with the presence of the marshals here.

5      So all that to say, again, Mr. Shofler, I -- I hope you

6  mean what you say.  I really do.

7              THE DEFENDANT:  I do.

8          THE COURT:  But to me, you're going to have to

9  demonstrate that first.  The words don't do it for me.

10             THE DEFENDANT:  Okay.

11         THE COURT:  And I'm sorry to say this even in front of

12 your sister because I -- you know, I know they care about you.

13 I know that she wrote, you know, a very poignant letter saying

14 that, you know, she wants to have you in.

15     Did you want to say something else?

16             THE DEFENDANT:  Yeah, when you're done.

17         THE COURT:  Okay.  And, you know, they're here today

18 to show your support -- their support for you, and that's --

19 that's meaningful to me.

20     But I think maybe, you know, if they're not completely

21 antagonistic to what I'm saying, they may -- they may agree

22 with you and say, "Well, you know, you need to demonstrate that

23 first.  You need to demonstrate that to us," and you need to

24 demonstrate to the Court that you can behave yourself and

25 achieve these aspirational goals that you've talked about

1    today.

2         Anyway, go ahead.  You wanted to say something else?

3         **THE DEFENDANT:**  Yeah.

4         I don't disagree with your line of thought, but I -- what

5    I will say is the person being spoken of and the only true

6    arbiter of myself -- that you're brilliantly wrong, and I can

7    say that.  I understand -- on paper, I understand this and

8    that.

9         Mr. Bilinski is saying, basically, that no mental health

10   treatment, no -- no medication, which I've been taking in

11   custody, which I did not take when I was in his -- his care --

12   I didn't take any medicine.  And, apparently, Mr. Bilinski is

13   saying that I don't need medication, I don't need treatment, I

14   don't need any of these sort of services.  And I will hold him

15   to that -- to -- the next one to that, if that's the case.  I

16   disagree with that.

17        Past is not prologue.  Yes, past does predict certain

18   things, but it's not wholly predictive of -- of -- of what it

19   is.  There would never be, in -- in my life, where I will hurt

20   anyone.  And I would never disrupt a classroom, which I hold to

21   almost the same degree as I hold this court here almost.  With

22   the degree of respect that I have, I would never do so.

23        That's -- so I will attend college, certainly.

24        **THE COURT:**  How do you -- how do you reconcile the

25   incident in the bank, then, when you completely lost your cool

1   over what would be an irritating matter, but a trivial matter,

2   to most people?  Most people would not do what you did.  They

3   would not threaten to kill --

4           **THE DEFENDANT:**  That's true.

5           **THE COURT:**  -- the teller.  They would not threaten to

6   kill the teller's family.  They wouldn't get into an alter- --

7   altercation with another customer.

8           **THE DEFENDANT:**  I deeply regret it.

9           **THE COURT:**  All -- all of those things indicate to me

10  that, you know, you don't have self-control, and these

11  instincts come over you, and you act on them.

12      And the other thing that's troublesome to me -- I alluded

13  to this when I asked your lawyer a question -- is, you know,

14  this tapers off.  And that's been my experience, too, is people

15  get older -- you're 46 now; right?

16          **THE DEFENDANT:**  47.

17          **THE COURT:**  Yeah.  47.

18      Okay.  So it starts to taper off partly because we're not

19  the men we were when we were in our 20s; right?  But with you,

20  that hasn't been the case.  It hasn't been the case.  It's like

21  you're looking for trouble or, like, you have such a short fuse

22  that -- you know, if anybody crosses you in any way, boom, it's

23  triggered.

24      So --

25          **THE DEFENDANT:**  I understand.  I understand your

1  assessment.  I -- I would once again ask that I be given an

2  opportunity.

3        **THE COURT:**  Well, I'll do that, but I just don't think

4  you're ready for it now.

5        **THE DEFENDANT:**  Okay.

6        **THE COURT:**  Here's what I'm telling you, and I'll tell

7  you straight.

8        **THE DEFENDANT:**  Yes, sir.

9        **THE COURT:**  You've got to demonstrate that you've

10 earned this --

11       **THE DEFENDANT:**  Okay.

12       **THE COURT:**  -- and you do that by compliant behavior

13 while you're in custody.  So the next report I get -- you know,

14 if somebody says, "Well, you know, let him out now.  Sign some

15 kind of release that will let him out early," I'd ask the same

16 questions I asked today.

17     What has he done in the interim since this hearing?  Has

18 it been compliant behavior?  Is he -- is he barking at the

19 guards?  Is he -- is he, you know, being antisocial, or has he

20 really started down a path that you talk about, an aspirational

21 path, that said, "I want to do these other things.  I want to

22 live life outside of prison"?

23       **THE DEFENDANT:**  Yeah.

24       **THE COURT:**  Now, if you can establish that to my

25 satisfaction, then I think my attitude would be completely

1    different, and I'd be willing to give it a try.  But there's no

2    track record here of you making an effort to do that.  It's

3    just the opposite.

4         THE DEFENDANT:  If you gave me that opportunity, I

5    will prove it to you.

6         THE COURT:  Well, I'm going to give you the

7    opportunity, but you're going to have to establish it through

8    compliant behavior in custody.

9         At this point, my judgment is you're just too dangerous to

10   be let go in the community, and what I suggest to you is you

11   take advantage of prison programs.  I'm willing to recommend

12   confinement in some place, if Bureau of Prisons would do it.

13   It's just a recommendation.  It's up to them.

14        I don't know if your, you know, past behavior is going to

15   necessarily mean you have to go to the maximum-security place.

16   Where were you before?  Were you --

17        THE DEFENDANT:  I will -- I will be housed maximum

18   security.

19        THE COURT:  Because of the in-custody --

20        THE DEFENDANT:  Yes.

21        THE COURT:  Yeah.

22        Well, I would think, even there, you may have some

23   opportunities, for example, to start college curriculum

24   classes, college classes.  Take some things like that.  Maybe

25   get a certification in some trade.  I hope this isn't pie in

1    the sky.  I hope those opportunities are available to you in

2    the Bureau of Prisons.

3        But for me, you've got to show me, with a track record of

4    compliant behavior, that -- that you're not going to be

5    irascible, that you're not going to blow up and be in a fight

6    and threatening to kill people and kill people's family because

7    that's -- that's the same old, same old with me.

8            THE DEFENDANT:  Yeah.

9            THE COURT:  I look back at all these things you've

10   done.  It's all been, you know, violence and threats of

11   violence.  Again, I don't say those things to make you feel

12   bad.  I want you to understand why I've reached the decision I

13   have.

14           THE DEFENDANT:  Okay.

15           THE COURT:  And I know you disagree with my reasoning,

16   and I get that.

17       So turning to the sentencing guidelines, they're -- I note

18   that there is no disagreement about the applicable guidelines

19   and the defendant's exposure.  Pardon me.  The Court agrees

20   with the parties' -- well, the Government's calculations, which

21   the defense also agrees.

22       There are three cases in front of me now.  As to

23   Case 16-CR-07053 -- I suppose it should now be "LAB."  It's

24   "BEN" here, but the case has been transferred to me.  So it

25   should be "LAB" -- the defendant has admitted to a Grade A

1  violation, and that's combined with the Criminal History

2  Category III.  That is the criminal history category that was

3  applicable at the time of his sentence for the bank robbery.

4  The guidelines for that offense are 18 to 24 months.

5      The Government's recommended that the Court impose a

6  sanction of time served, which I agree with, with no further

7  supervision to follow in that case.  So that's what I do.  I

8  impose time served on -- on that case.

9      You've been in now almost two years?

10         **THE DEFENDANT:**  Over two years.

11         **THE COURT:**  On -- just on this violation?

12         **THE DEFENDANT:**  Two years and four days -- five days.

13         **THE COURT:**  Did they pick you up on a detainer from

14  state prison?  Is that what they did?

15         **THE DEFENDANT:**  Yes, sir.

16         **THE COURT:**  And so you say that's the time after the

17  feds picked you up and brought you here?

18         **THE DEFENDANT:**  November -- November 1st, I was

19  released from state prison.

20         **THE COURT:**  2021?

21         **THE DEFENDANT:**  '21.

22         **THE COURT:**  Okay.

23         **THE DEFENDANT:**  Yeah.

24         **THE COURT:**  So -- well, if it runs over, then, the

25  maximum custody here is -- is 24 months.  So it's time served

with the recognition that the maximum term he can receive is
24 months.

I understand he's done an extra, what, five days?  Six
days?  Something like that?

**THE DEFENDANT:**  Yeah.

**THE COURT:**  As to 16-CR-07054-LAB, again, the
defendant has admitted to a Grade A violation.  This time, the
criminal history score is higher.  He's in Category VI, given
the subsequent criminal history that followed after the other
offense.

His guidelines in this case are 51 to 63 months.  This
guideline range applies because the defendant's supervised
release term resulted from a sentence for a Class A felony.  So
a sentence of up to 60 months can be imposed.  That's the cap
under 18 U.S.C. 3583(e)(3).

The Court finds, in this case, that a 60-month sentence,
as a sanction for this behavior, is warranted, and I do impose
that.  That's consecutive to the time-served sentence that I
had previously imposed.

As to Case 16-CR-07055-LAB, again, a Grade A violation,
with the defendant in Criminal History Category VI, he faces a
guideline range of 33 to 41 months.  In this case, the Court
imposes no sentence.  I'm not even going to run it concurrent.
I think it's -- the sanction that I imposed on the second case
covers the third case.

1    And any sentence beyond 60 months -- any sanction beyond

2    that, I find, would be excessive in light of the fact that the

3    defendant does have support of his family.  He has support of

4    others who have written letters, including the people in the

5    program that was proposed.

6        And hope springs eternal, I hope, Mr. Shofler -- or I

7    think, Mr. Shofler.  So, you know, I hope that the words that

8    you spoke today are coupled with some mental discipline on your

9    part --

10           **THE DEFENDANT:**  All right.

11           **THE COURT:**  -- and the ability to control yourself and

12   not get into trouble and to think ahead and say, you know, "If

13   I do this, I'm going to be back in an orange jumpsuit in front

14   of the judge again, and the judge was skeptical of me last

15   time.  I'm going to demonstrate to him that I mean what I say

16   here.  I want to" -- "I want to turn the page here.  I want to

17   be a productive citizen.  I don't want to spend the rest of my

18   life in a jail cell, whether a state or federal jail cell."

19       Now, if you come to me with that kind of track record, I

20   would take a chance on you.  I would, notwithstanding that --

21   you know, the awful things you've done in the past.  But you've

22   got to earn that, and I think, you know, that's exactly what

23   the probation officer is saying, too.  Demonstrate, show us,

24   that you mean what you're saying today.

25       So that's the Court's decision on these three cases.  As

1   far as continuing supervised release, there's none on the first

2   case.  Supervised release is terminated.  As to the second and

3   the third cases, the defendant shall remain on supervised

4   release for a period of 24 months following the completion of

5   the sanction that the Court's imposed here, 24 months.  It will

6   run concurrent, one -- one case with the other.

7         There are mechanisms for you to petition the Court, and

8   I'm sure Ms. Peloquin will talk -- talk to you about that.  And

9   you've heard me say several times today that I'm willing to

10  consider this differently if you demonstrate that you can

11  comply, that I'm not worried that you're going to get out and

12  hurt somebody.  So keep that in mind, too.

13        I want to incentivize you to be a good citizen in prison,

14  to turn the other way when you're provoked.  I'm not talking

15  about not defending yourself or self-defense, but stay away

16  from those situations.

17              **THE DEFENDANT:**  All right.

18        **THE COURT:**  You know, it's possible.  I've had a lot

19  of people come back that have been in prison.  They have --

20  they've got an unblemished record.  So provocations can't be

21  that great just because it's you; right?

22              **THE DEFENDANT:**  Right.

23        **THE COURT:**  It has to -- it has to do with your --

24  your reaction to some of these provocations, I think, and I

25  want you to think about that.

1          THE DEFENDANT:   Okay.

2          THE COURT:   So that's it.

3      Is there -- are there any other recitals that the

4  Government or defense think are necessary?

5          MS. PELOQUIN:   No, Your Honor.   I object to the

6  sentence as procedurally and substantively unreasonable.

7          THE COURT:   As -- as -- I'm sorry?

8          MS. PELOQUIN:   I'm just objecting to the sentence, for

9  the appellate record, as procedurally and substantively

10  unreasonable.

11          THE COURT:   Okay.   So on the procedural objection,

12  tell me what I did wrong here, and I'll fix it before it goes

13  up to the Court of Appeal.   What -- what procedure didn't I

14  follow correctly?

15          MS. PELOQUIN:   Your Honor, I think that the Court

16  should have taken more into consideration the release plan that

17  we had for Mr. Shofler, I think, with respect to the need to

18  consider rehabilitation for him under the sentencing factors

19  and also, I think -- and the need to promote -- or to protect

20  the public.

21      I understand the Court's position has largely been that

22  protecting the public comes with a longer custodial sentence,

23  but I do think that the Court can also consider that

24  rehabilitative programming also protects the public and that

25  the services that we offered to the Court are part of that

1  calculation --

2          THE COURT:  Okay.

3          MS. PELOQUIN:  -- and should have been further

4  considered.

5          THE COURT:  Let me be more specific, then.

6      I find it would be irresponsible, on my part, at this

7  point to release him into the public, in particular to a

8  community college like Palomar, given his violent tendencies.

9          And I base that not just on his track record of violence

10  and the -- and the violent convictions, including, you know,

11  federal -- felony assault and second-degree murder but also on

12  the track record that's recited by the psychiatrist just -- as

13  I tried to emphasize to Mr. Shofler, just since he's been in

14  federal custody on this.

15      So I'm satisfied that that answers the procedural

16  objection.  The substantive unreasonableness is always

17  available to you.

18      So --

19          MS. PELOQUIN:  Thank you, Your Honor.

20          THE COURT:  -- anything else on behalf of the

21  United States?  Any other recitals that are necessary?

22          MS. PREWITT:  Your Honor, under 18 U.S.C. 3583(h), the

23  length of any supervised release that's imposed at the

24  revocation cannot exceed the original term of supervised

25  release less any term of imprisonment that was imposed.

```
 1         And so what I'm getting at here, Your Honor, is I'm a
 2    little bit --
 3              THE COURT:  You think there's no supervised release on
 4    the second case left?
 5              MS. PREWITT:  Correct.
 6         And I --
 7              THE COURT:  Do you agree with that, Mr. Bilinski?
 8              THE PROBATION OFFICER:  I do agree with that,
 9    Your Honor.
10              THE COURT:  Okay.  So the Court amends the judgment,
11    then.
12         Supervised release on the second case is -- is not ordered
13    because there's no time left on that, but on the third case --
14    again, I can give you the number --
15              THE COURTROOM CLERK:  7055.
16              THE COURT:  Yes.
17         -- 16-CR-07055-LAB, there is time left.  The Court imposes
18    two years of supervised release on the same terms and
19    conditions that were originally imposed.
20              MS. PREWITT:  Is the Court imposing time served on
21    7055?
22              THE COURT:  I haven't imposed any sentence on that.
23    The --
24              MS. PREWITT:  Got it.  Got it.
25              THE COURT:  The decision whether to sanction is
```

1   discretionary, and I've exercised discretion not to sanction

2   him on that, given the sanction I imposed on the second one.

3   So there's no time to be counted against that.

4           **MS. PREWITT:**  Great.

5       Thank you, Your Honor.  Appreciate the clarification.

6           **THE COURT:**  Okay.  Good -- good luck, Mr. Shofler, and

7   I truly mean that.  Good luck.

8       Demonstrate to me that, you know, you can get out and

9   control your anger.  And, you know, there may be a possibility

10  that Ms. Peloquin can come back to me at some point or that

11  there's some mechanism, under the statutes, for you -- or the

12  sentencing guidelines -- for you to come back and ask me to

13  reconsider this.  All right?

14          **THE DEFENDANT:**  Okay.

15          **THE PROBATION OFFICER:**  Your Honor, I apologize.  If I

16  may, on the 7055, then, if the Court has imposed -- if the

17  Court is not imposing a sentence, he's just -- the Court's

18  continuing supervised release in that case; is that correct?

19          **THE COURT:**  So that's what it -- so that's what -- how

20  I should characterize it?

21          **THE PROBATION OFFICER:**  Yes.

22          **THE COURT:**  It's not -- yeah.  Because I didn't --

23          **THE PROBATION OFFICER:**  Correct.

24          **THE COURT:**  Because I didn't revoke him?

25          **THE PROBATION OFFICER:**  Correct.

1          **THE COURT:**  Okay.  Continuing supervised release,

2    then, in the -- what -- how much time is left?

3          **THE PROBATION OFFICER:**  Well, if we're continuing

4    supervised release --

5          **THE COURT:**  It would be tolled from the time that the

6    warrant went out on this --

7          **THE PROBATION OFFICER:**  That's correct.

8          **THE COURT:**  -- through the time that he's in custody

9    on another sanction.

10         **THE PROBATION OFFICER:**  And then once he's available

11   for supervised release again, then we'll commence that period

12   on the 7055.

13         **THE COURT:**  What is -- what's the length of that

14   period potentially?  Is it more than 24 months?

15         **THE PROBATION OFFICER:**  Three years.

16         **THE COURT:**  So 36 months?

17         **THE PROBATION OFFICER:**  Well, no.  If we are

18   continuing supervised release --

19         **THE COURT:**  Yeah.

20         **THE PROBATION OFFICER:**  -- he was already sentenced to

21   three years' supervised release on that matter originally.

22         **THE COURT:**  But he was out a month and a half before

23   he got arrested.

24         **THE PROBATION OFFICER:**  Right.  Yes.

25         **THE COURT:**  So there's, like, 34 months left?

1          **THE PROBATION OFFICER:**  Yeah.

2     So there would still be a significant period of supervised

3 release for him.

4          **THE COURT:**  Okay.  Again, that's always subject to

5 early termination.  I didn't know that.  Because I have not

6 imposed a sentence on that, there's no knocking off time

7 because of an imposition of a custodial sentence.

8     The Court imposes continuing supervised release of

9 34 months, not -- not -- not 24, 34 months -- on the last case,

10 then, the 055 case.

11          Again, I tell you, Mr. Shofler, I -- and I think your --

12 your lawyer will confirm this.  People that do well on

13 supervised release and have an established track record and

14 come in and say, "Let me off the hook" -- I often do that.  I

15 often sign early termination.

16     But it all depends on you and your ability to control

17 yourself.  Okay?

18          **THE DEFENDANT:**  Yeah.

19          **THE COURT:**  Good luck.

20          **MS. PELOQUIN:**  Your Honor, would the Court recommend

21 housing in the Western Region, as close to Southern

22 California --

23          **THE COURT:**  I will.

24          **MS. PELOQUIN:**  -- as possible --

25          **THE COURT:**  Yeah.

1          I recommend housing --

2               **MS. PELOQUIN:**  -- for family visits?

3               **THE COURT:**  Where were you the last time you were in

4     federal prison?  Which one?

5               **THE DEFENDANT:**  USP Lewisburg, Pennsylvania.

6               **THE COURT:**  Yeah.

7          I don't -- again, it's a recommendation.  You probably

8     know better than I, given your classification, but I'll

9     recommend Western Region.  All right?

10              **MS. PELOQUIN:**  Thank you, Your Honor.

11                   (Proceedings adjourned at 11:34 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Monday, November 27, 2023

8

9

10

11              _____/S/ James C. Pence-Aviles_____

12          James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                          U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25